The next item on our calendar is Conte v. Emmons. Counsel? Good morning. May it please the court, Ellie Scheibel for the defendant's appellants. Your honors, we are here today because the jury verdict in this case constitutes a manifest injustice. It's an injustice that this court can and should correct. I'd like to address three points today. First, contrary to the district court's holding, a lawful investigation of fraud complaints by a DA's office does not constitute some evidence of tortious interference with contract. There was no evidence of tortious interference here. Was this a lawful investigation? Yes, it was. It was sparked by the sworn complaints that they received from over 46 individuals alleging that this plaintiff had committed fraud and was not operating a legitimate business. Was this raised at any time below the argument that this was a lawful investigation and the case should be dismissed? I think throughout the trial, the defense's main argument was that they were investigating pursuant to the complaints and that they followed the standard procedures that they would use in any investigation. I have another question here, and that is that you're taking the position that a manifest injustice would occur here, and that's because the arguments were not made in the 50A, but were raised in 50B. Is that right? We would maintain that the immunity argument was sufficiently raised in the 50A. I understand that, but I have another question, and that is whether the other side ever objected on that basis at the time of the 50B or on the initial appeal. They did not in the 50B or in the first appeal. We've argued in the brief that they have waived the argument that we need to show manifest injustice. We have several cases that support that position, don't we? Yes, we do. And if that's the case, then the standard would not be manifest injustice, right? No, it would be a straight judgment as a matter of law. It was as though it was preserved all the way. Correct. Yeah. Yes, Your Honor. So you have two different standards. You're putting the higher bar in front of you rather than the lower bar at this point. Yes, Your Honor, because we think we meet that higher bar and therefore also the lower bar of just judgment as a matter of law regularly because I think the district court basically conceded that there was not sufficient evidence here of tortious interference. I also want to address the conclusion, which I think was completely unsupported, that plaintiff could have shown additional evidence if only the Rule 58 had been more specific and particularly focusing on the Giamo affidavit. On the issue of whether there was some evidence, we've addressed this, but under New York law, it has to be intentional interference with contract. It cannot be interference that is incidental to lawful government activity. Didn't this very issue go before the jury? No, it did not, Your Honor. I don't think this issue went before the jury, and I don't think there was any evidence from which a reasonable jury could find that this was not a lawful investigation. There was no evidence whatsoever that these DAs were personally motivated. There was no evidence of misuse of the subpoena power. Just because it went before the jury wouldn't matter if the evidence was insufficient. Correct. It would still be a legal issue. Right. And wasn't there also an issue here of whether the defendant's conduct caused the breaches? There was an issue as to whether there was causation. There was an issue as to whether there was any breach at all. Right. But in any event, even assuming there was a breach, that they breached or that they discontinued, I thought what was the evidence, or I'll be asking the other side what the evidence was, if any, that there was a causation as opposed to just business reasons that these people decided not to continue with the business arrangements, either in terms of the distributors or the advertisers. Your Honor, I think that we would completely agree with you that there was no evidence of causation here. There was lots of evidence that distributors were independently disgruntled with this plaintiff. There was lots of evidence that the reason that there was no breach by printer is that they stopped printing for plaintiff because he didn't pay them. The only thing I can make out that plaintiff cites as evidence in his brief on appeal is the existence of the civil complaint by the distributors. But I don't think the existence of a civil complaint shows causation or breach of contract. It doesn't reference the DA's investigation. It references those distributors' individual interactions with the plaintiff and their belief that he had committed fraud. So I would agree there was no evidence of causation here. And on the issue of the district court, one of the district court's primary holdings was that there was no manifest injustice because maybe plaintiff could have presented additional evidence to satisfy the elements of the claim. I think that that was unfounded legally. It didn't address the waiver points, the double waivers. It did not. So what about immunity? Are you still pressing that part? Yes, we are. We still maintain that these defendants are entitled to absolute immunity under state law. It was an investigation, was it? It was an investigation. So you can't get absolute immunity, right? Under the state law cases, I believe you can. But you have a variety of immunity arguments. One of them is qualified immunity. Am I right? Under the state law, it would only be qualified immunity if it was held that absolute did not apply. Right. But you, on appeal, are also arguing qualified immunity in the alternative. Am I right? Yes. Wasn't this issue waived? No, I don't believe the issue was waived. During the 50A argument, there was a colloquy that defendants were specifically raising the immunity arguments that they had raised in their summary judgment motion. In the summary judgment motion, they had argued for immunity under state law. They cited two cases regarding their immunity in the context of a prosecutor conducting an investigation. And there is case law that in New York, investigation is a discretionary function for which the official is entitled to absolute immunity. We've cited a number of those cases. As far as qualified immunity goes, we don't accept you on the absolute immunity here. The jury awarded punitive damages, correct? Yes, they did. So doesn't that necessarily show bad, as an indication by the jury, that they made a finding of bad faith? I don't think you can rely on that as evidence of bad faith. I think there needs to be evidence of bad faith to support the jury's finding. Here, there was none. There was no evidence whatsoever that these defendants acted out of malice. The investigation was only, the evidence was only that they were following the investigation. I think by the investigator at some point, Falzano, Falzerano, whatever his name was, that to the effect that he was going to get Conte. I think there was testimony from Mr. Conte that Falzerano told him when he served the subpoena that he would get him. I don't think that's enough in the whole context of this to make out bad faith on the part of all three defendants. You disagree whether there was sufficient evidence before the jury to reach a bad faith conclusion. That's really what you're saying. Yes. Wasn't there evidence that one of the defendants told either the printer or the distributors that this was a Ponzi scheme? No, there was evidence that after plaintiff's business had ceased operations, after he had already gone out of business, a lawyer had called the district attorney's office and that during the course of the conversation, the term Ponzi scheme may have been used. There was no evidence that it was used by the DA. And when asked specifically, the ADA's testimony was, I never told the lawyer you were a fraud. I never told him you were a scam. He told me those things about you. That's what the testimony was. There was testimony from Conte himself that these things were being said. But I take it's your position that that was all hearsay. Our position is it was all hearsay. And under the New York, we cited a number of New York cases that say that vague allegations by the plaintiff, that third parties stopped doing business with him, are not enough to make out a claim of tortious interference. Thank you, counsel. You've reserved two minutes for rebuttal. Yes. We'll hear from Mr. Conte. Good morning, May. Pleased to court. Michael Zhu for the Plaintiff Appellee. We believe that the district court got it right in denying the defendant's 50B motion on both grounds, on whether it was waived or under a manifest injustice standard. With respect to the manifest injustice . . . Let's look at the waiver point, first of all, because if you didn't object on the basis at the 52 . . . in opposition to the 52 motion, and you didn't appeal that, why didn't you waive the waiver point? Well . . . You follow me? Good question. Yes, yes. You're talking about with respect to the district court's first . . . Yes. The first decision. I called it Conte 1 in my brief, so I'll refer to that as there. I don't have a good answer, Judge. If it was waived below by the plaintiff in failing to raise that argument, I don't have a good answer as to why it's not waived. If it was waived, then the test is not manifest injustice. Then it's just a straight whether there was sufficient evidence. It just goes forward as whether the evidence was sufficient. Even under that standard, Judge, as we argued in our brief, I would say that 1, there was sufficient evidence of tortious interference, and 2, that . . . I was going to say 2, the manifest injustice, but no. What was the evidence of causation? The causation evidence came through witnesses' testimony, especially . . . Hold on, I have it here. Mr. Hoppe, or Hope, H-O-P-P-E, he testified that he was one of the distributors who was questioned by the investigators. The investigator basically came out and said that we're investigating Conte. He's a sham. He's a fraud. If you tell anybody about this conversation that I'm having with you, I'm going to charge you with obstruction. This is Falazano. This came through testimony with the investigator, Falazano. So, it was through this that Mr. Hoppe said that, well, I got scared. Once this person from the investigators, from the DA's office, came and spoke to me, I didn't want to do any business with them anymore. I thought he took the position also that that was not what caused him to do it, but that the product wasn't available, and that, therefore, he wasn't receiving the magazines from Conte to distribute. Because the printers stopped working with Conte. Because he didn't pay them, isn't that right? Because he didn't pay them. And also because the printers were approached by the DA's office and advised that there was an investigation. And what was the evidence of that? Through testimony of, there were letters. There were letters. There was a letter that was, and an e-mail that was sent to and from the printer indicating that there was an investigation going on. But that doesn't make it clear that that was the causation here. But you're relying on Hoppe. Or Hoppe. Hoppe, yes. Hoppe. And Hoppe said that he wasn't getting a product, and that's the reason he did it, not because he was intimidated or scared off by the investigator. But he also said he felt he was threatened. Yes. The jury heard all of this with respect to the evidence that went in. So the argument would be that there was sufficient evidence of this interference. And, you know, the jury is free to disregard or accept the evidence. Yes. Hoppe did say that, and I'm quoting, his conversation with Mr. Falzano had no bearing whatsoever on his continued business relationship with iMedia. Now, you're saying the jury could disregard that. Yes. And could have accepted that part of the testimony where he said, I felt I was threatened, where Falzano asked for names of other distributors, which was given over by Hoppe, and that he was told that plaintiff's business was a fraud? Slim evidence of causation, given his position, given Hoppe's position. But the jury was entitled to weigh this and assess the credibility of the witnesses. So, counsel, if I could just shift one moment to the issue of qualified immunity. Sure. And, of course, the issue of immunity is one for the court, not for the jury, ultimately. Yes. And do you know of any state court case where qualified immunity was denied for a reason other than the following two? One, fabricating evidence. And two, a prosecutor acting in excess of their lawful authority or jurisdiction. So you're saying outside of these two. Right. Is there anything that the prosecutor did here in their investigations that would have meant they couldn't rely on the theory of qualified immunity? They arrested someone with probable cause. They sent out letters. They sent out subpoenas. They interviewed witnesses. Is there anything here that wouldn't be covered by the doctrine of qualified immunity? Yes. If the conduct was done outside of the scope of the investigation. That's your argument, isn't it? Yes, it is. What was done outside the scope, if I may follow up on that? That it was a personal grudge against Mr. Conte? Yes. And is there evidence of that in the record? Through the testimony of Mr. Conte. Sure. I'm sorry. This investigation began when two people came to the DA's office, Mr. Cotullo and then Mr. Guerra, I guess, with complaints against Mr. Conte. Sure. Oh. Yes. That's how the investigation began. But as the argument was throughout the case in a trial by Mr. Conte was that there was no evidence of fraud or . . . Complaints were unfounded? Yes. I'm sorry, Judge. Yes. The complaints were unfounded as to the criminal acts that were alleged as against Mr. Conte. And yet the DA . . . With its investigation, despite the memo . . . There was actually a memo that was written by Wallace to Eamons, or I may have gotten the names mixed up . . . Where it was determined that the list of 28 names on that list were not defrauded. And there was no evidence and that the evidence and that the investigation should be dropped. So, again, this all goes into a pool. This evidence, this whole body, the body of evidence goes in and a jury assessed the witnesses and assessed the credibility. And found, in awarding punitive damages, that there was bad faith. And that there was evidence of ill will. And when you have evidence of bad faith or malice or ill will, then the state does not . . . The state actors are not entitled to a qualified immunity. I can only conclude that the jury loved your client and hated the other guys. Which they're entitled to do. They are. And that's why we have a jury system. What about, apart from any intimations of juries operating solely on the basis of emotion . . . What was the evidence of . . . here of intent? Intent to interfere, tortuously interfere with a contract? Personal intent. Not just the fact that it happened. Not just the fact that the contracts were breached, if they were. And not the fact that things were said. But that there was an intent to cause the breaches. Because that's what's required. Yeah, I mean . . . Specific intent to cause the breaches. In most situations we get, with tortuous interference, there's a single contract. And somebody has come in and said things and driven one of the parties to breach the contract. Intentionally, in order to disrupt that contract. What's the evidence of that here? Well, just through the testimony from the plaintiff and also from Mr. Hoppe . . . That the investigators continued to pursue this action, this course, this investigation. Despite knowing that there was no evidence to support. That would have the effect of causing the breaches incidentally. It wasn't that they focused on disrupting the contracts. Sure. I mean, if you go around telling people that I'm a terrible lawyer, then no one would ever hire me. If you go around telling somebody that this gentleman here is a fraud, then no one's ever going to do business with him. Whether they had other reasons to not do business with him is irrelevant. We have to go back to look at the New York cases. But my understanding here is that more is required. That it has to focus on a contract, a particular contract. And it's not just bad things are said, and then as a result, nobody does business. Well, it's inferrable. That doesn't open up the door to tortious interference. No, I believe. But that's inferrable, because you're never going to get somebody to get up on his stand and say, yes, I deliberately told him these things so that he would not do business with him anymore. I mean, if we had this smoking gun, then that would have been established during trial. But obviously, he didn't. His way of proving this was to have witnesses get on the stand and say, I was told, and I was threatened, and I felt threatened because I didn't want to do business anymore. And for all these reasons, that the investigators were telling me that this is a bad person, that he can't be trusted. Those are all very good reasons why a jury would find that the DA's office here procured these breaches through this conduct. Mr. Conte was pro se during that trial, wasn't he? Yes, he was. Well, during the trial, he did have an attorney standing by and assist in doing the cross or examination of Mr. Conte himself, yes. But otherwise, he was pro se. Thank you. Thank you. Counsel, you have two minutes for rebuttal. Thank you. I want to quickly address two things. One, the investigation here was not unfounded. They put into evidence all of the complaints and documents received, the memos that were written through the course of this, which did not conclude that there was insufficient evidence, or did not conclude that they didn't want to proceed with indictment until August of 2006. There's a June 2004 memo at page 2160 of the appendix that lays out what the witnesses would testify to and why they believed at that time that they could, in fact, pursue charges for fraud. Why was the, your adversary just argued a minute ago that conducting an investigation and saying bad things about the plaintiff here was sufficient when the contracts were ultimately, the parties, the counterparties refused to perform under the contracts, sufficient to make out a case of tortious interference? And you're arguing that an intent to interfere requires more. Is that correct? That is correct. We've said a number of cases. I jotted down the state law cases on tortious interference on this point. Montana, Abramowski, Franbilt, Crystal Brothers are all cases against public officials where the court said there is no intentional interference here. There's also a case, I want to say it's the Schmidt case, where there was evidence that the town stopped doing business with the contractor and he said it was because of interference from other contractors and the court said we can't infer that that's the causation here because the town was independently upset with your performance. So even if the evidence showed what plaintiff claims it does, which I don't believe it does if you look at what the testimony and actual documents show. I don't even think there's actual interference. But there is certainly no evidence of intentional interference and he has not cited any New York case law where public officials were held liable for tortious interference with contract. I want to make a quick point about the use of subpoenas. You asked if this investigation was lawful. The undisputed testimony was also that there was always a grant, that a grand jury had been convened and was always calendared on the return date of the subpoenas, which we explained in the Hirschfeld case is all that is required. It was never held. The grand jury was . . . what was not done was that they actually sought . . . that they actually did presentment for an indictment. But the grand jury was convened and calendared and available to the extent that someone receiving the subpoenas wanted to go before the grand jury. Thank you. Thank you both. We'll reserve decision. The last case on our calendar is on submission. So I will ask the clerk to adjourn court. Court is adjourned.